1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DEMETRIUS SHAFFER,                    No.  2:15-cv-2591 JAM KJN P

12              Petitioner,

13      v.                                 <u>FINDINGS & RECOMMENDATIONS</u>

14   WILLIAM MUNIZ,

15              Respondent.

16

17   I.  <u>Introduction</u>

18          Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  The opinion of the California Court of Appeal accurately

20   summarizes the charges of which petitioner was convicted:

21              In the early morning hours of Thanksgiving 2010, defendant
               Demetrius Shaffer went to the apartment of T.T., who was alone
22             there. Over the next three hours, he committed several sexual
               offenses against her, including oral copulation, genital penetration,
23             and rape. A few weeks later, in the early morning hours of New
               Year's Day 2011, defendant attacked R.S., sexually penetrated her
24             anus, and strangled her to death.

25             ****

26             The District Attorney charged defendant by information as follows:

27             • Count one: murder of R.S. (Pen.Code, § 187, subd. (a); hereafter,
               unspecified code citations are to the Penal Code) with special
28             circumstances of rape (§ 190.2, subd. (a)(17)) and anal penetration

                                         1

1   (§ 190.2, subd. (a)(17));

2   • Count two: anal penetration of R.S. (§ 289, subd. (a)(1));

3   • Count three: oral copulation of T.T. (§ 288a, subd. (c)(2));

4   • Count four: genital penetration of T.T. (§ 289, subd. (a)(2));

5   • Count five: oral copulation of T.T. (§ 288a, subd. (c)(2));

6   • Count six: oral copulation of T.T. (§ 288a, subd. (c)(2));

7   • Count seven: rape of T.T. (§ 261, subd. (a)(2));

8   • Count eight: rape of T.T. (§ 261, subd. (a)(2)); and

9   • Count nine: rape of T.T. (§ 261, subd. (a)(2)).

10  The jury found defendant guilty on all counts. On count one, the
    jury found the rape special circumstance not true, but found the anal
11  penetration special circumstance true.

12  The court sentenced defendant to life without possibility of parole
    on count one and imposed and stayed under section 654 a 15–year–
13  to–life term on count two. The court imposed consecutive terms of
    15-years-to-life on counts three through nine. The total term
14  imposed was life without possibility of parole, plus 105-years-to-
    life.

15

16  People v. Shaffer, 2014 WL 5281062 at * 1 (Cal. App. 2014).

17      The California Court of Appeal struck count 9 and the accompanying sentence on the

18  grounds that petitioner's trial attorney violated his right to counsel by allowing the prosecutor to

19  prove this rape using only inadmissible hearsay.  (Id. at *1, *19.)

20      This action proceeds on the amended petition filed February 8, 2017.  (ECF No.19).

21  Petitioner raises the following claims:  1) prejudicial joinder of charges; 2) insufficient evidence

22  to support count 2 and the special circumstance finding; 3) jury instruction regarding spousal rape

23  contained irrational permissive inference; 4) CALCRIM No. 3.02 diluted the prosecution's

24  burden of proof; 5) ineffective assistance of counsel; 6) insufficient evidence of petitioner's

25  mental state with respect to counts four through eight[1]; 7) insufficient evidence concerning two

26

27  [1]  In claim six, petitioner also alleges that there was insufficient evidence to support his mental
    state for count nine.  However, as discussed above, the California Court of Appeal struck
28  petitioner's conviction for count nine.

acts of oral copulation.

On July 21, 2017, petitioner filed a supplemental petition raising two new claims: 1) newly discovered evidence demonstrates that the DNA evidence used against him was inadmissible; and 2) the all-white jury was prejudicial. (ECF No. 27.) The undersigned also addresses these claims below.

After carefully reviewing the record, the undersigned recommends that the petition be denied.

II. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 4 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is

clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (*per curiam*)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). "[R]eview under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 102.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).

5

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any reasonable basis for the state court to deny relief. Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

III. Factual Background

The opinion of the California Court of Appeal contains a factual summary of petitioner's offenses. After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

////

////

## FACTS

Defendant's crimes occurred on Thanksgiving Day 2010 against T.T. (counts three through nine) and New Year's Day 2011 against R.S. (counts one & two). The defense strategy differed between the two victims—as to T.T., defendant primarily claimed the encounter was consensual and, as to R.S., defendant claimed that he was not the perpetrator. We provide a brief summary of the crimes here, and we recount the facts in greater detail in connection with defendant's sufficiency-of-evidence and other contentions.

### T.T. on Thanksgiving Day

Defendant went to T.T.'s apartment at approximately 3:00 a.m. on Thanksgiving. T.T. had previously been introduced to defendant, with whom she was on friendly terms, and let him in after he knocked. After a brief conversation, defendant suddenly grabbed T.T. by the neck causing her difficulty in breathing, threw her against the wall, and said, "Bitch, you gonna give me some pussy." Defendant threw T.T. to the floor, told her to pull her shirt up, told her to keep her hands on her breasts, and orally copulated her.

After this initial attack during which defendant choked T.T. and threw her against the wall and on the floor, defendant moved T.T. to a couch where defendant put his finger in T.T.'s vagina at least twice. He made her orally copulate him, during which she changed the manner in which she was orally copulating him to make him think she was enjoying it. He inserted his penis in her vagina at least twice.

Fearing for her life, T.T. went into "survival mode" and decided to pretend that everything defendant was doing was okay. Defendant was in T.T.'s apartment for about three hours. Toward the end of that time, several people came to the apartment, but T.T. did not ask for help because she did not want to get those people involved and she wanted to maintain defendant's trust.

### R.S. on New Year's Day

On New Year's morning 2011, the partially nude body of R.S. was found on the ground at the corner of Mills Park Drive and Folsom Boulevard in Rancho Cordova, close to the Rancho Club Casino. A pair of blue pants covered her face. She had a pink, powdery substance on her abdomen. When her body was lifted, the same powdery substance was on her back, and there was a broken makeup compact on the ground under her.

The cause of death was determined to be ligature strangulation.

Defendant's DNA was found on R.S.'s neck where there was bruising, on R.S.'s right breast, on R.S.'s abdomen, and under her fingernails. A hair, probably a pubic hair, identified as being from defendant, was found on R.S.'s sternum.

Other evidence connected defendant to R.S. on New Year's

7

morning.

At about 12:30 on New Year's morning, R.S. arrived at Michele Gaylord's apartment where they talked and smoked methamphetamine. Later, defendant also arrived at Gaylord's apartment. Defendant and R.S. went into Gaylord's bedroom together. About five minutes after defendant and R.S. went into the bedroom, Gaylord went into the room to see what they were doing. Defendant was sitting on the bed, and R.S. was standing at the foot of the bed. They were not touching each other. They were talking and were fully clothed.

Gaylord left the room, and, five minutes later, R.S. opened the door and invited Gaylord into the room to smoke methamphetamine. Defendant and R.S. were still fully dressed.

Defendant left the apartment soon after that. R.S. stayed for awhile then left around 3:30 a.m.

At 3:30 a.m., defendant and R.S. entered the Rancho Club Casino together and went to a blackjack table. At 3:39 a.m., defendant and R.S. left the casino together. These movements were recorded on the casino's video surveillance system.

Defendant was interviewed by detectives of the Sacramento County Sheriff's Department on January 4, 2011, three days after R.S.'s body was found. At first, defendant admitted being at Gaylord's with R.S. on New Year's morning and going to the casino together, but he denied having sexual relations with R.S. Defendant also claimed that they left the casino separately that morning. The detective pressed defendant about why his DNA would be found on her, and he continued to claim there were no sexual relations.

Later in the interview when the detectives continued to press defendant about his DNA being on R.S. when she was found, defendant claimed that at Gaylord's apartment he sucked on R.S.'s breasts and fondled her vagina.

Defendant claimed that he was not with R.S. after they left the casino. A detective told defendant that they had cameras, including by a gray utility box where R.S.'s body was found. After a cigarette break, defendant told the detectives that he and R.S. left the casino together and went to where she was killed. They talked there for a minute, defendant gave her some methamphetamine, and he left. He denied killing her.

Defendant relied for his defense on evidence that connected three other men to R.S.

The pants found over R.S.'s face belonged to Marvin Darrell Pierce, Jr. Analysis of the pants found Pierce's DNA on the pants. There was other DNA on the pants, but it could not be matched to anyone involved in this case.

Pierce testified that he was homeless and suffered from fecal

8

incontinence. He had soiled the pants, and they no longer fit him, so he got rid of them by throwing them over a barrier on Mills Park Drive a few days before R.S. was murdered.

Pierce and R.S. were friends, but they never had sexual relations. On New Year's Eve, Pierce saw Gaylord and R.S. at a bar before midnight. He gave her a kiss on the cheek. He left the bar and did not see R.S. again that night. Starting at about midnight, he slept in a friend's car in the parking lot of the Rancho Club Casino.

In addition to defendant's DNA, two other men's DNA was found on R.S.'s body. George Nixon was a minor contributor of DNA found on R.S.'s right breast, and John Meacham may have been included in DNA under R.S.'s fingernail. While defendant's DNA was found in the area of bruising on R.S.'s neck, the DNA of neither Nixon nor Meacham was found there.

Lakeshia Whittaker was arrested for shoplifting on January 19, 2011. She told the arresting officer that she had information concerning a recent homicide. She testified at trial that she made that statement because she hoped to get out of jail and also wanted the police to find the real killer. Whittaker met with a detective and told him that she heard Nixon, whom she knew as "G–Bone," say that he had killed R.S. and dumped her body after he and other men had sex with her. During her interview, however, she was inconsistent about when she heard Nixon. She asked the detective for leniency in exchange for the information.

On February 2, 2011, Whittaker was again arrested for shoplifting. On the way to the jail, she pointed out a house and claimed there was drug activity there. (The claim turned out to be unfounded.) She also told the officer she wanted to provide information about a homicide in exchange for leniency.

On October 27, 2011, Whittaker spoke to a defense investigator. She claimed that she did not know who killed R.S. and that she did not tell any detectives that Nixon did it. She said Nixon's name had come up because he had been seeing R.S.

On November 16, 2011, Whittaker was arrested on a warrant. She told a detective and a prosecutor that she had not heard Nixon say he killed R.S. She heard through the rumor mill that he had killed her.

At trial, Whittaker testified that she heard Nixon say, on January 1, 2011, that he had killed R.S. Whittaker admitted that she was addicted to methamphetamine, which makes her hallucinate and become delusional and affects her ability to remember things. She was willing to steal and lie to support her addiction. She had multiple prior convictions, including for petty theft, burglary, and forgery. And she was high on methamphetamine when she heard Nixon say he killed R.S.

Nixon testified that he had been dating R.S. shortly before her death. They had sexual relations on December 30 or 31, 2011. He

saw R.S. at a mutual friend's apartment around 1:30 on New Year's morning. Nixon left the apartment approximately 15 minutes later, and that was the last time he saw R.S. He denied killing R.S. or telling anyone that he killed R.S.

People v. Shaffer, 2014 WL 5281062 at *2-4.

IV. Discussion

A. Claim One: Alleged Improper Joinder

Petitioner alleges that the charges against victims R.S. and T.T. were improperly joined. The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends that the trial court prejudicially abused its discretion by denying his motion to sever for separate trials the counts alleging crimes against T.T. and R.S. The contention is without merit because the crimes were of the same class and were cross-admissible.
>
> When defense counsel made the motion to sever, he said: "I think the strongest argument in favor of severing the [T.T.] case from the [R.S.] case is the fact that we're dealing with a weak case, which I believe is the [R.S.] case." Counsel went on to explain that the T.T. rape case was stronger and that the evidence that defendant choked T.T. would be used by the jury to conclude that defendant also choked R.S.
>
> The trial court denied the motion to sever based on the cross-admissibility of evidence of the crimes. It noted the probative value of the similarities in the cases, such as pulling the shirt up over the breasts and choking the victim. [Footnote 1.]
>
>> [Footnote 1: Later, during trial, the court admitted evidence of the rape and murder of R.S. (as well as other prior sexual misconduct against other women) to establish intent, lack of consent, and motive in the rape of T.T., but the court excluded the same evidence to prove a common design or plan, holding that there were insufficient similarities.]
>
> Section 954 permits the joinder of "two or more different offenses of the same class of crimes or offenses." The law favors joinder of counts because it promotes efficiency. (People v. Myles (2012) 53 Cal.4th 1181, 1200.) Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts be tried separately. (§ 954; see People v. Thomas (2012) 53 Cal.4th 771, 798.) "'"The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.]'" (People v. Bradford (1997) 15 Cal.4th 1229, 1315.)

If the trial court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion. (People v. Ramirez (2006) 39 Cal.4th 398, 439.) In determining whether a trial court abused its discretion, we consider the record before the trial court when it made its ruling. (People v. Thomas, supra, 53 Cal.4th at p. 798.) "We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried. [Citation.] If the evidence would have been cross-admissible, then joinder of the charges was not prejudicial." (Ibid., italics added.)

On appeal, defendant argues that joinder was improper because it allowed the prosecution to try together two relatively weak cases. He also argues that the evidence of the crimes was not cross-admissible.

Joinder was permitted here under section 954 because the offenses against T.T. and R.S. were assaultive. Murder and rape are of the same class of crimes because they are both assaultive crimes against the person. (People v. Maury (2003) 30 Cal.4th 342, 395.)

Furthermore, the crimes against T.T. and R.S. were cross-admissible on the issue of defendant's intent, which means that defendant cannot show a prejudicial abuse of discretion in the trial court's denial of his motion to sever.

Evidence Code section 1101, subdivision (a) prohibits the use of evidence of a person's character, including evidence of character as manifested in uncharged conduct, to prove conduct on a specific occasion. The Evidence Code, however, recognizes that evidence of other criminal acts can be relevant for reasons other than to prove bad character. Under subdivision (b) of section 1101, evidence of criminal acts otherwise excludable under subdivision (a) may be admitted if the acts are "relevant to prove some fact ... other than [the defendant's] disposition to commit [a criminal] act." Evidence is most commonly admitted under subdivision (b) to prove (1) motive or intent, (2) a common design or plan between the uncharged and charged crimes, and (3) identity. (People v. Ewoldt (1994) 7 Cal.4th 380, 402–403 & fn. 6 (Ewoldt).)

In order to justify admission under Evidence Code section 1101, the uncharged conduct must bear some resemblance to the charged crime, although the requisite degree of similarity varies depending on the purpose for which the evidence is admitted. (Ewoldt, supra, 7 Cal.4th at p. 402.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result ... tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act....' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]'

11

[Citation.]" (<u>Ibid.</u>)

Defendant argued at trial, as he does again on appeal, that the rape charges against him regarding T.T. were unfounded because T.T. consented to the sexual activity. In other words, defendant denied that he intended to commit the acts against T.T.'s will. The sexual attack on R.S., therefore, was probative on the issue of defendant's intent with T.T.—that is, to violently commit sexual offenses against the victim's will.

"[A] fact finder properly may consider admissible 'other crimes' evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citations], and further (2) the threshold standard articulated in <u>Ewoldt</u> can be satisfied—that is, 'the factual similarities among the charges tend to demonstrate that in each instance the perpetrator harbored' the requisite intent. [Citation.]" (<u>People v. Soper</u> (2009) 45 Cal.4th 759, 778.)

As the trial court noted, the circumstances of the attacks on T.T. and R.S. were similar. Defendant violently attacked an isolated victim. The victim's shirt was pulled up over her breasts. And the victim was choked. These circumstances were sufficiently similar to allow the trial court to admit the evidence of the rape and murder of R.S. to prove defendant's intent with respect to the rape of T.T.

Both women were acquaintances of defendant, and defendant had obtained their confidence before sexually assaulting them. This is particularly significant when defendant claims consent as to one of the victims. Defendant gained T.T.'s confidence just like he gained R.S.'s. Defendant used that confidence to gain access into T.T.'s apartment, as well as to isolate R.S.

Defendant also argues that, even if the evidence was admissible under Evidence Code section 1101, subdivision (a), the evidence of the rape and murder of R.S. would have been excluded in a hypothetical separate trial on the rape of T.T. under Evidence Code section 352 because (1) the rape and murder of R.S. was "exponentially more inflammatory" than the rape of T.T., (2) the evidence would have confused the jury, and (3) it would have consumed too much time. We disagree.

The evidence of the rape and murder of R.S. was highly relevant on the issue of intent regarding the rape of T.T. Consent was the main issue litigated as to the rape of T.T., and, as discussed, the evidence of the rape and murder of R.S., along with other evidence, supported an inference that the rape of T.T. was nonconsensual. The fact that there was also a murder involved as to R.S. does not lead to a conclusion that the prejudicial effect of the R.S. evidence would have substantially outweighed its probative value. (Evid.Code, § 352.) The attacks were both sexual assaults involving choking of the victim. The admission of the evidence concerning the rape and murder of R.S. would not have confused a well-instructed jury in the trial on the rape of T.T. And the trial court's decision to admit the evidence despite the time it would have taken

1       to present the evidence would not have been an abuse of discretion.

2       The evidence was also cross-admissible on an Evidence Code section 1108 theory to establish propensity. (See People v. Medina

3       (2003) 114 Cal.App.4th 897, 902 [subsequent act admissible under Evid. Code, § 1108].)

4

5       Since the evidence of the rape and murder of R.S. would have been properly admitted at a hypothetical separate trial on the charges of the rape of T.T., cross-admissibility is established, and it is

6       unnecessary to consider whether the evidence of the rape of T.T. would have been properly admitted at a hypothetical separate trial

7       on the charges of the rape and murder of R.S. (See People v. Zambrano (2007) 41 Cal.4th 1082, 1129.)

8

9       Because the crimes were cross-admissible, we need not consider the other factors a trial court may consider in determining the propriety of joinder. (See People v. Soper, supra, 45 Cal.4th at pp. 774–775

10       [cross-admissibility normally sufficient to dispel suggestion of prejudice in joinder].) The trial court did not abuse its discretion in

11       denying the motion to sever.

12       Defendant argues that, even if the trial court did not abuse its discretion in denying the motion to sever, the joinder of the charges

13       actually resulted in gross unfairness amounting to a denial of his due process rights. We disagree.

14

15       Even if the trial court's pretrial ruling denying a motion to sever was correct when made, we must reverse if the defendant shows

16       joinder actually resulted in gross unfairness, amounting to a denial of due process. (People v. Arias (1996) 13 Cal.4th 92, 127.)

17       Here, there was no gross unfairness. Defendant attempts to show that some of the prosecution evidence that seemed stronger before

18       trial actually did not have as much probative value as anticipated at trial. Based on this analysis, he claims that the joinder resulted in

19       gross unfairness because it allowed the jury to rely on the aggregate evidence of the crimes to convict rather than considering the

20       evidence as to each crime by itself. To the contrary, because the evidence of the crimes was cross-admissible, joining them did not

21       result in gross unfairness. (People v. Ochoa (1998) 19 Cal.4th 353, 409–410.) In any event, as summarized in the review of facts above

22       and discussed later with respect to defendant's substantial evidence contentions, the evidence was not as weak as defendant contends.

23

24     People v. Shaffer, 2014 WL 5281062 at *4-7.

25         There is no clearly established Federal law which holds that joinder or consolidation of

26     charges may violate the Constitution.  In United States v. Lane, 474 U.S. 438, 446 n.8 (1986), the

27     Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the

28     Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it

results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."

However, in <u>Young v. Pliler</u>, the Ninth Circuit stated:

> <u>Lane</u> considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. <u>See</u> <u>Lane</u>, 474 U.S. 438, 446 & n.9 (1986). Thus, <u>Lane</u>'s broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72 (2003).

<u>Young</u>, 2008 WL 1757564 at *n.1 (9th Cir. 2008) (unpublished); <u>see</u> <u>also</u> <u>Collins v. Runnels</u>, 603 F.3d 1127, 1132–33 (9th Cir. 2010).

To determine "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id.</u> Given that there is no clearly established Federal law in this instance, the court cannot grant relief because habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent…and so we must defer to the state court's decision").

Even assuming that the Supreme Court's footnote in <u>Lane</u> could be considered clearly established Federal law, no constitutional violation occurred because the prejudice was not so great as to deny petitioner his right to a fair trial. <u>Lane</u>, 474 U.S. at 446, n.8. As noted by the California Court of Appeal, much of the evidence was cross-admissible. The undersigned also agrees with the California Court of Appeal that the evidence against petitioner, with respect to the charges concerning both T.T. and R.S., was not as weak as he alleges.

For the reasons discussed above, the undersigned recommends that claim one be denied.

B. <u>Claim Two: Alleged Insufficient Evidence of Count Two and Special Circumstances Finding</u>

*Legal Standard*

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. <u>Herrera v. Collins</u>, 506 U.S. 390, 401–02 (1993). The prisoner, however, "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of <u>Jackson</u>. <u>Juan H.</u>, 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

<u>Id.</u> (citations omitted).

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16. In performing a

15

Jackson analysis, a jury's credibility determinations are "entitled to near-total deference." Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S. at 326.

*State Court Opinion*

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. The California Court of Appeal denied this claim for the reasons stated herein:

> The jury convicted defendant of first degree murder of R.S. with a special circumstance that the murder was committed while attempting or completing sexual penetration of the anus. He was also convicted of a separate count of sexual penetration of the anus. Defendant contends that the evidence presented at trial was insufficient to sustain the jury's finding that defendant attempted or completed a penetration of R.S.'s anus. The contention is without merit.
>
> "'In considering a claim of insufficiency of evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.]' [Citation.] 'The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.' [Citation.] Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citations.]" (People v. Farnam (2002) 28 Cal.4th 107, 142–143 (Farnam), italics omitted.)
>
> "Lack of trauma to a victim's rectum does not preclude a finding that the victim was sodomized. [Citation.]" (Farnam, supra, 28 Cal.4th at p. 144.) As noted, we look at all the evidence in determining whether attempted or completed anal penetration took place.
>
> A forensic pathologist testified that R.S. had superficial tears in the tissue around her anus. She found no sperm in that area. In her written findings, the pathologist concluded that the tears were "suspicious for sexual assault." She noted that hard stool could have caused the damage, but that the stool in R.S.'s body was soft.

16

Defendant argues that "[i]f the sole basis for a criminal charge is expert medical opinion, and the medical expert cannot even make a finding to support the charge on a preponderance of evidence, but can only state a suspicion, no reasonable jury can make a finding of guilt beyond a reasonable doubt." This is a reasonable statement of law on its face, but it does not reflect the evidence in this case on which we rely to determine whether it was sufficient to sustain a finding that defendant attempted or completed anal penetration.

The evidence concerning the attack on R.S. must be considered as a whole. R.S. was found in a condition suggesting she had been subject to a sexual attack. She was partially nude, and defendant's DNA and hair were found on her body in locations suggesting sexual activity. R.S. was found on her back, and underneath her was a broken compact makeup case with powder. The same powder was found on her abdomen, which indicated that she had been on her stomach during the attack. Therefore, R.S. was attacked sexually, and at least some of the time she was on her stomach. Together with the expert testimony that she had tears in the tissue of her anus, this evidence was sufficient to sustain a finding that defendant penetrated R.S.'s anus during the attack.

Even if the evidence in this case of injuries to the victim's anus was not sufficient by itself to sustain the finding that defendant attempted or completed anal penetration, it is sufficient together with the rest of the evidence. The injuries were consistent with anal penetration, or attempted penetration, even if they were not conclusive. Therefore, defendant's contention that the evidence was insufficient to sustain a jury finding that defendant penetrated or attempted to penetrate R.S.'s anus is without merit.

People v. Shaffer, 2014 WL 5281062 at *7-8.

*Analysis*

Petitioner challenges his convictions for the special circumstance of anal penetration, in violation of California Penal Code § 190.2 (a)(17), and anal penetration, in violation of California Penal Code § 289 (a)(1). The undersigned begins by discussing the elements of these California Penal Code sections.

An act of sexual penetration accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person violates California Penal Code § 289(a)(1). In contrast, California Penal Code § 190.2(a)(17) permits the jury to find a special circumstance if the murder was committed while the defendant was engaged in *or* attempting the commission of rape by an instrument, in violation of California Penal Code § 289. The opinion of the California Court of Appeal does not clearly

17

discuss the distinction between petitioner's conviction for violating § 289(a)(1), which could not be based on an attempt, and his conviction for § 190(a)(17), which could be based on an attempt.[3]

Turning to the evidence presented regarding petitioner's convictions for § 289(a)(1) and § 190(a)(17), as noted by the California Court of Appeal, the victim was found partially nude.[4] (See RT at 247, 272.) Criminalist Shaw testified that swabs from fingerprints on R.S.'s abdomen met petitioner's DNA profile. (Id. at 658-59.) Fingerprint swabs from R.S.'s right breast also met petitioner's DNA profile. (Id. at 659-60.) In addition, makeup powder was found on the victim's stomach, suggesting that she had laid on her stomach during the attack. (See id. at 274-75.) Forensic Pathologist Fiore testified regarding the victim's anal injuries. On direct examination, Fiore testified regarding two photographs of the victim's anus. (Id. at 617.)

> Um, these are photographs taken of the anus. What they show is that there's some tears in the surface skin around the opening there. Um, 92 – they're both evidence in both 92 and 93. One is more of a little closer view of the other, but they're very superficial tears in the tissue around the anus.

(Id.)

Fiore testified that she did not find any sperm on smears taken from the victim. (Id.) Fiore testified that she made a finding of "suspicious for sexual assault" based upon the superficial tears in discovery of a semi-nude body in an outside location. (Id.)

On cross-examination, Fiore testified further regarding her findings:

> Q: Now, with respect to what [the prosecutor] termed evidence of suspicious for sexual assault, that's not how your report terms it; is that right? Mr. Ho used the word "suspicious."
>
> A: In the addendum, I downgraded my initial findings from "evidence of" to "suspicious for" after examining the microscopics

---

[3] In petitioner's case, the jury was also instructed that petitioner could be found guilty of attempted penetration with an unknown object. (CT at 1020.) Attempted sexual penetration is a lesser included offense of sexual penetration. See People v. Lopezquinonez, 2017 WL 3276434 at *8 (Cal. App. 2017).

[4] The exhibit list describes exhibit no. 7 as a photo of a "partially clad woman's body." (See Respondent's Lodged Document 11, Volume 1 of reporter's transcript, exhibit list.) Exhibit no. 8 is described as a photo of "upper body of a partially clad woman's body." (Id.) Witnesses testified that these photos accurately depicted R.S. when she was found. For example, James Tucker, who found R.S., testified that the photo depicted what he saw when he found R.S. (RT at 247.)

18

of the anal canal.

Q: There was a change where you thought that there was, in fact, evidence of sexual assault but then you changed that or modified that to say maybe it's just suspicious for sexual assault?

A: When I –in looking at the tissue with the naked eye, it appeared to me that there was a hemorrhage associated with some of the tears. But when I looked at it under the microscope, I couldn't confirm that finding. So I downgraded my –it was more just congestion of the blood vessels. So I didn't have any evidence that there was, you know, any extensive trauma there. There were mucosal tears with some congestion.

Q: Did you kind of move –the area we're talking about the anus and the area around the anus?

A: Correct.

Q: Originally did you think the superficial tears were part of the anus, but then you said that they weren't part of the anus, that they were outside what would be interpreted the anus?

A: No, I never changed anatomy. They were always in the anal canal, anus, you know, I never changed the anatomy. I just changed that I thought that there was actually hemorrhage associated with the tears.

Q: In your amended report you talk about superficial tears around the anal verge with mucosal congestion. What is the anal verge?

A: Well, I removed the entire anus. So you –you have the skin which has some tears which what we saw in the photographs, you know, that you will see in the photographs that Mr. Ho showed. But also on the inside of the canal where it's not on the outside this is a transition between the anus and the rectum. And that's the anal verge. So there's a short area canal about, you know, an inch or so long, and there was some internal tears there as well. So we have the histology. I looked at both from the outside as well as on the inside of the canal.

Q: You used the term "histology."

A: That's looking at it under the microscope.

Q: Now, as far as the tears themselves you interpreted them very superficial?

A: They are superficial. They involve the surface layers of the tissue but don't go deep into the wall.

Q: And as that related to sexual assault, are those type of very superficial injuries that you saw also consistent with different types of trauma than sexual assault?

A: Such as?

Q: Well, I'm asking you.

A: Well, I mean –

Q: As someone wiping too hard.

A: Not on the inside. You know, some things you might think about are hard stool you, somebody has really hard stool they might cause some damage. But she had soft stool in her, so that was one thing I look at [sic] could there be some other things, something else being penetrated in there could cause it, you know, but –

Q: How about a fall on the bottom?

A: No.

Q: The –can you establish the age of the superficial tears around the anal verge?

A: There's no inflammatory response to it. So none of the body's cell defenses are coming there to fix it. And so, again, you know, you have to have some survival time to start seeing the body react to cell damage or tissue damage. So there's no signs of any body response to it. So I would have to say it's within, you know, contemporaneous to the events surrounding her death not the days before. So something within the hour.

Q: Could the superficial tears have occurred at 10:00 o'clock that night? Can you rule that out?

A: Well, probably not completely. I mean she—10:00 o'clock at night and she was known to be alive until like 3:00 in the morning, 3:30 in the morning. So that's many hours. You would expect there to be some signs of some early response by then. But –

Q: Now, as far as that lack of sperm detected on smears, is that consistent with not having sexual intercourse?

A: Well, if people use condoms, there won't be any sperm left behind. So the absence of sperm doesn't exclude it.

(Id. at 622-25.)

Fiore later testified about how she characterized the evidence:

Q: And how would you characterize the difference in the change or the grading of the evidence for sexual assault down to suspicious for sexual assault? What is the difference?

A: One –in the first where I'm saying there's evidence of it, I'm

20

being more definitive about it that this is definitely happened. It's, you know, these are strong factors. And the others I'm saying that they are highly suspicious for but I can't prove it one way or the other.

(Id. at 625.)

After reviewing the record, the undersigned finds that the jury was presented with sufficient evidence from which it could reasonably conclude that petitioner actually penetrated R.S.'s anus. This evidence included the conditions of the victim's body, i.e., partially clothed with make-up on her abdomen, suggesting she had laid on her stomach during part of the attack by petitioner. In addition, petitioner's DNA was found in fingerprint swabs taken from R.S.'s abdomen and right breast.

The testimony of Forensic Pathologist Fiore also supported the jury's finding that petitioner penetrated R.S. Fiore testified that the R.S. had superficial tears in her anus. Fiore testified that a hard stool could cause such superficial tears, but R.S. had soft stool in her. Fiore's testimony that the superficial tears occurred close in time to R.S.'s death also supports a finding that they were caused by petitioner penetrating R.S. While Fiore's testimony demonstrated that the penetration was slight, a conviction for § 289(a)(1) may be based on evidence of slight penetration. From this testimony, and the other evidence discussed above, a reasonable jury could conclude that petitioner penetrated R.S.

Because there was sufficient evidence to support petitioner's conviction for violating § 289(a)(1), i.e, that petitioner penetrated R.S., there was sufficient evidence to support petitioner's conviction for violating § 190(a)(17). Accordingly, the denial of these claims by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.

C. Claim Three: Alleged Jury Instruction Error Regarding Spousal Rape

Petitioner argues that CALCRIM No. 1191 contained an irrational permissive inference that allowed the jury to use evidence of prior acts of spousal rape to infer that he was likely to commit the predatory sexual offenses that were charged against him.

////

1

*State Court Opinion*

2      The California Court of Appeal is the last state court to issue a reasoned decision

3   addressing this claim.  The California Court of Appeal denied this claim for the reasons stated

4   herein.

5              Defendant contends that the court's instruction to the jury
               concerning use of propensity evidence (CALCRIM No. 1191)
6              allowed the jury to make an irrational permissive inference, thus
               violating his due process rights. We conclude that the inference
7              permitted by the instruction was not irrational and, therefore,
               defendant's due process rights were not violated.
8

9              A. Background

10             At trial, the prosecution introduced the testimony of three of
               defendant's former wives concerning sexual offenses he committed
11             against them when they were married. I.M. testified that defendant
               hit her, pinned her down, and choked her at times. Between 10 and
12             15 times, he also forced himself on her sexually. M.A. testified that
               defendant choked her at times. He forced himself on her sexually
13             many times. One time, he did so after he beat her up all day in front
               of his cousins. T.B. testified that defendant subdued her by choking
14             her before committing sexual offenses. Defendant believed that a
               wife does not have the right to say no but must submit to her
15             husband.

16             Evidence Code section 1108 allows evidence of a defendant's
               uncharged sexual offense to establish the defendant's propensity to
17             commit sexual offenses. (People v. Falsetta (1999) 21 Cal.4th 903,
               907.) Consistent with Evidence Code section 1108, the trial court
18             instructed the jury using CALCRIM No. 1191. The second to the
               last paragraph of the court's instruction was as follows (with the
19             part defendant finds objectionable in italics):

20             "If you decide that the defendant committed the uncharged [forcible
               spousal rape] offenses, you may, but are not required to, conclude
21             from that evidence that the defendant was disposed or inclined to
               commit sexual offenses, and based on that decision, also conclude
22             that the defendant was likely to commit the sexual offenses charged
               here. If you conclude that the defendant committed the uncharged
23             offenses, that conclusion is only one factor to consider along with
               all the other evidence. It is not sufficient by itself to prove that the
24             defendant is guilty of the sexual offenses charged. The People must
               still prove the charge beyond a reasonable doubt."
25
               B. Evidence Code section 1108 and Due Process
26
               The California Supreme Court has held that admission of
27             propensity evidence under Evidence Code section 1108 does not
               violate due process and fair trial rights. (See People v. Reliford
28             (2003) 29 Cal.4th 1007, 1012–1016; People v. Falsetta, supra, 21
               Cal.4th at pp. 910–922; see also People v. Schnabel (2007) 150

Cal.App.4th 83, 87 [relating specifically to CALCRIM No. 1191].)

California courts have also held that to be admissible under Evidence Code section 1108, evidence of prior uncharged sexual offenses need not be similar in their facts to the sexual offense currently charged. To allow the inference the defendant has a propensity to commit sexual offenses, it is enough that he committed sexual offenses in the past. "The charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (People v. Frazier (2001) 89 Cal.App.4th 30, 40–41, fn. omitted; see also People v. Mullens (2004) 119 Cal.App.4th 648, 659.)

C. Constitutionality of CALCRIM No. 1191 in this Case

CALCRIM No. 1191 allowed the jury to draw an inference based on the prior uncharged sexual offenses that he had a propensity to commit sexual offenses. This type of inference (a permissive inference) violates a defendant's due process rights if it cannot be said "with substantial assurance" that the inferred fact is "more likely than not to flow from the proved fact on which it is made to depend." (County Court of Ulster County v. Allen (1979) 442 U.S. 140, 166, fn. 28.) The California Supreme Court has stated that "'[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.'" (People v. Mendoza (2000) 24 Cal.4th 130, 180, quoting Francis v. Franklin (1985) 471 U.S. 307, 314–315.) A permissive inference is constitutionally invalid "only if there is no rational way the jury could draw the permitted inference." (People v. Pensinger (1991) 52 Cal.3d 1210, 1243–1244.)

Defendant's contention is a variation on the argument that prior uncharged offenses must be sufficiently similar to the current offense to allow admission. He claims that the instruction, which does nothing more than apprise the jury of the proper use of evidence admitted under Evidence Code section 1108, allowed the jury to infer that defendant committed the sexual offenses charged in this case by basing that inference on his prior commission of the uncharged spousal rapes, which he contends were not sufficiently similar to justify the inference.

Specifically, defendant gives two reasons the uncharged spousal rape evidence could not give rise to a rational permissive inference that defendant committed the sexual offenses in this case. He claims: (1) it is irrational to infer a propensity to commit sexual offenses against women other than his wife from the fact that he committed sexual offenses on his wives in the past and (2) it is irrational to infer a propensity to commit the sexual offense of anal penetration from the fact that he committed sexual offenses not involving anal penetration in the past.

To the contrary, the instruction does not allow the jury to draw an irrational inference. (See People v. Reliford, supra, 29 Cal.4th at pp. 1012–1016; People v. Falsetta, supra, 21 Cal.4th at pp. 910–922.) Even if there are dissimilarities between the prior uncharged offenses and the current offenses, any dissimilarity goes to the weight of the evidence, not to the admissibility of the evidence or constitutionality of the permissive inference.

The inference allowed in this case was consistent with defendant's due process rights relating to permissive inferences. In fact, the California Supreme Court has found that the inference of a propensity to commit sexual offenses reasonably follows from past sexual offenses. In Reliford, the court said: "The ... instruction permits jurors to infer the defendant has a disposition to commit sex crimes from evidence the defendant has committed other sex offenses. The inference is a reasonable one." (People v. Reliford, supra, 29 Cal.4th at pp. 1012, fn. omitted.)

But defendant argues that we must look more specifically at his uncharged conduct. Doing so, he concludes that the uncharged offenses cannot be used to prove current propensity to commit sexual offenses because they involved spousal rape, which was not the case here. In this regard, he blames the uncharged conduct on his "archaic and outmoded views" that a wife is required to submit to a husband's sexual advances at all times. He also concludes that the uncharged sexual offenses did not involve anal penetration, which occurred in the attack on R.S.

Defendant's argument, however, ignores the ways in which his uncharged conduct was similar to the attacks in this case. In each instance of uncharged conduct, defendant violently attacked his wife and subdued her to commit the sexual offenses. The same is true here. In the uncharged conduct defendant used choking to subdue the victim and commit the sexual offenses. Both victims in this case were choked. In other words, defendant's attacks on his wives were not so dissimilar from the attacks in this case as he would have us believe. In addition to the similarities, the number of times defendant attacked his wives and the number of victims both support an inference that defendant has a propensity to commit sexual offenses.

Based on the similarities in the past and current sexual offenses and the California Supreme Court's holding that it is reasonable to infer from past sexual offenses that a defendant has a propensity to commit sexual offenses, we conclude the permissive inference contained in CALCRIM No. 1191 was not irrational and did not violate defendant's due process rights. There was nothing irrational about inferring from defendant's violent sexual attacks on his wives that he has a propensity to commit sexual offenses.

People v. Shaffer, 2014 WL 5281062 at *8-10.

24

1      *Analysis*

2      At the outset, the undersigned observes that petitioner does not challenge the

3 constitutionality of CALCRIM No. 1191 per se. The Ninth Circuit has upheld similar versions of

4 this instruction. See Schultz v. Tilton, 659 F.3d 941, 945 (9th Cir. 2011). Moreover, the United

5 States Supreme Court has never held that the introduction of propensity evidence violates due

6 process. See Estelle v. McGuire, 502 U.S. 62, 68-70 (1991).

7      Petitioner argues that CALCRIM No. 1191 contained an irrational permissive inference

8 that permitted the jury to infer a propensity to commit predatory sex offenses based on prior acts

9 of spousal rape. Petitioner argues that the prior acts of spousal rape were not sufficiently similar

10 to the charged acts of predatory rape. Petitioner also argues that because the prior spousal rapes

11 did not involve sodomy, they were not sufficiently similar to the charged sodomy.

12      The Supreme Court has stated that the Due Process Clause of the Fourteenth Amendment

13 "protects the accused against conviction except upon proof beyond a reasonable doubt of every

14 fact necessary to constitute the crime with which he is charged." Francis v. Franklin, 471 U.S.

15 307, 313 (1985) (quoting In re Winship, 397 U.S. 358, 364 (1970)). "This bedrock, axiomatic

16 and elementary constitutional principle prohibits the State from using evidentiary presumptions in

17 a jury charge that have the effect of relieving the State of its burden of persuasion beyond a

18 reasonable doubt of every essential element of a crime." Id. (internal quotation marks, citations,

19 and alternations omitted).

20      A permissive inference does not require a jury to draw a conclusion, but "suggests to the

21 jury a possible conclusion to be drawn if the state proves predicate facts." Francis v. Franklin,

22 471 U.S. at 314. Permissive inference instructions are constitutional unless the conclusions the

23 instruction suggests cannot be justified by reason and common sense in light of the proven facts

24 before the jury. Id. at 314–15; Hanna v. Riveland, 87 F.3d 1034, 1037 (9th Cir.1996);

25      The California Court of Appeal found that CALCRIM 1191 did not contain an irrational

26 permissive inference because the uncharged conduct was similar to the charged sexual offenses,

27 even though the charged offenses did not involve spouses and the offense involving R.S. involved

28 anal penetration. The California Court of Appeal found that, in the uncharged conduct, defendant

1  used choking to subdue his former wives and then committed the sexual offense.

2      The undersigned clarifies the uncharged act evidence herein.  Tanesha Brown, Mary

3  Arthur and Itxlana Marquez testified regarding their past relationships with petitioner.  While

4  Brown testified that she had been married to petitioner, it unclear whether petitioner actually

5  married Arthur or Marquez.

6      Brown testified that petitioner sometimes forced her to have sex with him by covering her

7  mouth which made it hard to breath.  (RT at 719-20.)  Brown also testified that petitioner had also

8  strangled her when he forced himself on her sexually.  (Id. at 721.)  Arthur testified that petitioner

9  had choked and strangled her.  (Id. at 734.)  Arthur testified that petitioner forced her to have sex

10  with him by holding her down.  (Id. at 735-36.)  Marquez testified that during her relationship

11  with petitioner, there were times when he choked or strangled her.  (Id. at 749.)  Marquez also

12  testified that petitioner had forced her to have sex with him by holding her hands down.  (Id. at

13  753.)  Marquez could not remember if petitioner ever choked her when he forced himself on her.

14  (Id.)

15      Brown, Arthur and Marquez all testified that petitioner forced them to have sex with them.

16  Only Brown testified that petitioner choked her when he force himself sexually on her.  Arthur

17  and Marquez testified that petitioner choked them, but not when he forced himself on them

18  sexually.

19      The California Court of Appeal's finding that the uncharged conduct was sufficiently

20  similar to the charged attacks so as to create a permissive inference was not an unreasonable

21  application of clearly established Supreme Court authority.  In the uncharged conduct and

22  charged attacks, petitioner used violence to subdue the women in order to have sex.  In the

23  charged attacks and the uncharged conduct involving Brown, petitioner choked the victims in

24  order to subdue them.  The California Court of Appeal also correctly found that the number of

25  times that petitioner attacked Brown, Arthur and Marquez, and the number of victims in the

26  charged attacks, both supported an inference that petitioner had a propensity to commit sexual

27  offenses.

28      Petitioner is correct that none of the uncharged conduct involved sodomy.  However, the

fact that petitioner committed sodomy on R.S. did not render the uncharged conduct so dissimilar so that the permissive inference was irrational.

The California Court of Appeal's finding that CALCRIM No. 1191 did not contain an irrational permissive inference was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

### D. Claim Four: Alleged Jury Instruction Error Regarding CALCRIM No. 302

*State Court Opinion*

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends that the trial court diluted the People's burden of proof by giving CALCRIM No. 302, concerning evaluation of conflicting evidence, without separately instructing the jury that a defendant presenting third party culpability evidence need only raise a reasonable doubt concerning his own culpability. He claims that CALCRIM No. 302 may have left an impression in the minds of the jurors that it should allow the third party culpability evidence to raise a reasonable doubt only if that evidence was believable and convincing. We conclude that, even assuming error for the purpose of argument, defendant was not prejudiced by the instructions as given.

> During trial, defendant relied on a defense, among others, of third party culpability with respect to the R.S. counts. He argued that Pierce, Nixon, or Meacham committed the crimes.

> A defendant need not show beyond a reasonable doubt that a third party was responsible for the crime; instead, a third party culpability defense is successful if it raises a reasonable doubt that defendant was responsible. (People v. Earp (1999) 20 Cal.4th 826, 887 (Earp).)

> The trial court instructed the jury concerning the reasonable doubt standard and about evaluating conflicting evidence. On the latter point, the trial court used CALCRIM No. 302, which states: "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

27

The trial court did not instruct specifically on third party culpability evidence. (See Earp, supra, 20 Cal.4th 826 at p. 887.)

Defendant argues: "When applied to the issue of third-party culpability, the instruction on evaluating conflicting evidence (CALCRIM No. 302) dilutes the People's burden of proof by suggesting that the jury may credit third party culpability evidence in defendant's favor only if the jury finds that the third party culpability evidence is believable and convincing, and if the evidence fails to convince either way, that the issue can be ignored."

"When reviewing ambiguous instructions, we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights. (Cf. Estelle v. McGuire (1991) 502 U.S. 62, 72.)" (People v. Rogers (2006) 39 Cal.4th 826, 873.)

A decision from our state Supreme Court, Earp, supra, 20 Cal.4th 826 is helpful in determining whether it is reasonably likely the jury construed CALCRIM No. 302 in a manner that violated defendant's right to have the jury determine his guilt beyond a reasonable doubt. In Earp, the court found harmless a trial court's refusal to give a third party culpability instruction (assuming for the sake of argument that the instruction applied). The court reasoned: "The jury was instructed under [the reasonable doubt instruction] that the prosecution had to prove defendant's guilt beyond a reasonable doubt, and the jury knew from defense counsel's argument the defense theory that [the third party], not defendant, had committed the crimes. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed [third party culpability] instruction, it would have come to any different conclusion in this case. [Citation.]" (Earp, supra, at p. 887.)

The Supreme Court has "held that even if ... instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citations.]" (People v. Hartsch (2010) 49 Cal.4th 472, 504.)

Similar reasoning applies here, making it unlikely the jury misconstrued the burden of proof. The jury was properly instructed that the People had to prove defendant guilty beyond a reasonable doubt. The defense at trial was that someone other than defendant was R.S.'s killer. In closing argument, the defense emphasized the presumption of innocence and the beyond-a-reasonable-doubt standard. And counsel argued to the jury that the third party culpability evidence "raise[d] a huge reasonable doubt in this case...."

Defendant's speculation that the jury may have ignored the reasonable-doubt instruction here because of the instruction on how to evaluate conflicting evidence is unconvincing. Therefore, his contention of instructional error is without merit.

28

People v. Shaffer, 2014 WL 5281062 at *10-12.

*Analysis*

Jury instructions that shift the burden of proof to a defendant or vitiate the requirement that the prosecution prove guilt beyond a reasonable doubt are of course unconstitutional. See Sandstrom v. Montana, 442 U.S. 510, 520(1979); In re Winship, 397 U.S. 358, 364 (1970). However, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." Victor v. Nebraska, 511 U.S. 1, 5 (1994). The Ninth Circuit Court of Appeals has instructed the reviewing habeas court to "determine whether there was a reasonable likelihood that the jury understood the instruction to allow a conviction predicated on proof that was insufficient to meet the requirements of due process." Lisenbee v. Henry, 166 F.3d 997, 999 (9th Cir. 1999).

At the outset, the undersigned observes that petitioner's counsel did not request an instruction regarding third party culpability. Thus, petitioner is claiming that the trial court erred in failing to give a third party culpability instruction sua sponte.

The undersigned finds that the California Court of Appeal reasonably found that the trial court's reading of CALCRIM 302, and failure to sua sponte instruct regarding third party liability, did not dilute the prosecution's burden of proof. The California Court of Appeal correctly found that the reasonable doubt instruction adequately instructed the jury regarding the prosecution's burden of proof, and correctly observed that petitioner's counsel argued that the third party culpability evidence raised a reasonable doubt as to whether petitioner killed R.S. (See RT at 1019-43 (defense counsel's closing argument addressing third party culpability defense.)) Based on these circumstances, the California Court of Appeal reasonably found that it was unlikely that the jury misconstrued the prosecution's burden of proof. See also Winn v. Lamarque, 2012 WL 5990763 at *1 (9th Cir. 2012) (California Court of Appeal did not violate the Due Process Clause in holding that it was "unnecessary for the trial court to give an instruction on third-party culpability, in part because the other instructions made it sufficiently clear that the prosecution had to prove beyond a reasonable doubt that Winn killed the victim.").

The California Court of Appeal reasonably rejected petitioner's speculation that the jury may have misapplied or ignored the reasonable doubt instruction with respect to the third party culpability evidence. The jury is presumed to have followed the reasonable doubt instruction. See Weeks v. Angelone, 528 U.S. 225, 234 (2000).

The California Court of Appeal did not violate clearly established Supreme Court authority when it found that the trial court's reading of CALCRIM No. 302, combined with its sua sponte failure to give a third party culpability instruction, did not dilute the prosecution's burden of proof. Accordingly, this claim should be denied.

E. Claim Five: Alleged Ineffective Assistance of Counsel

*Legal Standard for Ineffective Assistance of Counsel*

The two-prong Strickland standard governing ineffective assistance of counsel claims is well known and oft-cited. Strickland v. Washington, 466 U.S. 668 (1984). It requires petitioner to establish (1) that counsel's representation fell below an objective standard of reasonableness; and, (2) that counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 692, 694. "The question is whether an attorney's representation amounted to deficient performance under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. 86, 105 (2011) (citing Strickland, 466 U.S. at 690). Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Richter, 562 U.S. 86, 111–12 (2011)).

In reviewing a Strickland claim under the AEDPA, the federal court is "doubly deferential" in determining whether counsel's challenged conduct was deficient. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. 86, 105 (2011).

*State Court Opinion*

30

Petitioner raises two ineffective assistance of counsel claims. First, petitioner alleges that counsel was ineffective for failing to request a third party culpability instruction. Second, petitioner alleges that counsel was ineffective for failing to object when the prosecutor misstated the law regarding third party culpability during closing argument.

The California Court of Appeal is the last state court to issue a reasoned opinion regarding these claims. The California Court of Appeal denied these claims for the reasons stated herein:

> Ineffective Assistance of Counsel Concerning Third Party Culpability
>
> Drawing our attention again to his third party culpability defense, defendant contends that his trial counsel violated his right to counsel by (1) failing to request an instruction on third party culpability and (2) failing to object to comments by the prosecution concerning how to evaluate third party culpability evidence. We conclude that (1) defendant's right to counsel was not violated on the instructional issue because, even assuming counsel should have requested an instruction, the failure to do so was not prejudicial and (2) the prosecutor's remarks were unobjectionable.
>
> "To succeed in a claim of ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that, but for counsel's error, the outcome of the proceeding, to a reasonable probability, would have been different. (Strickland v. Washington (1984) 466 U.S. 668, 687–688, 693–694; People v. Ledesma (1987) 43 Cal.3d 171, 216–218.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, the claim on appeal must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (People v. Mendoza Tello (1997) 15 Cal.4th 264, 266.)" (People v. Lawley (2002) 27 Cal.4th 102, 133, fn. 9.)
>
> It is not necessary for the court to examine the performance prong of the test before examining whether the defendant suffered prejudice as a result of counsel's alleged deficiencies. (Strickland v. Washington, supra, 466 U.S. at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." (Ibid.)
>
> A. Failure to Request Third Party Culpability Instruction
>
> As noted, the trial court did not instruct the jury specifically as to third party culpability. On appeal, defendant asserts his trial counsel should have requested an instruction. We need not consider whether counsel should have requested an instruction because it is not reasonably probable that the outcome of the proceeding would have been different if counsel had requested the instruction.

As we discussed in connection with defendant's contention that the instructions may have led the jury to apply the wrong standard of proof, the failure to give a pinpoint instruction on third party culpability is harmless. (People v. Hartsch, supra, 49 Cal.4th at p. 504.) The reasonable-doubt instruction gave defendant the opportunity to argue, using the third party culpability evidence, that the prosecution did not prove defendant's guilt beyond a reasonable doubt. There is no indication that a separate third party culpability instruction would have made a difference in the verdicts. (Ibid.)

B. Failure to Object to Prosecutor's Comments

The defense relied on testimony of Lakeshia Whittaker that she heard Nixon say he killed R.S. During closing argument, the prosecutor commented on Whittaker's credibility:

"Lakeshia is an interesting witness. And when we talk about Lakeshia I want to ask you a simple fundamental question that we're going to return to.

"Is Lakeshia Whittaker the type of person that you would rely upon to make an important life decision?"

After this comment, the prosecutor spent some time talking about factors affecting Whittaker's credibility, including, among other things, lack of corroboration, bias, drug use, self-interest, and faulty memory.

After this discussion, the prosecutor said:

"So I go back at the end of the day to this. Is Lakeshia Whittaker the type of person that you would rely upon to make an important life decision?

"I'm not talking about some mundane every day decision. I'm talking about a decision where you're at a crossroad in your life: Who to marry. Who not to marry. What career to take. What surgeon to pick to operate on your child. Important life decisions.

"And if you had one of those important life decisions let me ask you, would you rely upon Lakeshia Whittaker to make that important life decision?

"And if your answer is no, then we toss aside what she had to say. You pull up your sleeves and you take a look at the rest of the evidence."

Defendant argues: "The prosecutor's argument that third-party culpability testimony should be rejected unless it meets an 'important life decision' standard misstated the People's burden of proof. It was the People's burden to show that the third-party culpability evidence did not raise a reasonable doubt as to [defendant's] guilt. The prosecutor's argument was an attempt to avoid that burden by arguing that jurors should employ a higher standard in judging the third-party culpability testimony."

32

In support of his argument that the prosecutor's comments misstated the standard of proof, defendant cites primarily to a case in which the prosecutor actually tried to define the reasonable-doubt standard. (People v. Nguyen (1995) 40 Cal.App.4th 28, 36 (Nguyen).) In that case, the prosecutor argued: "'The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes.'" (Id. at p. 35.)

The Nguyen court "strongly disapprove[d]" of these statements suggesting the reasonable doubt standard is used in daily life. (Nguyen, supra, 40 Cal.App.4th at p. 36.) Unlike the prosecutor's comments in Nguyen, the prosecutor's comments here focused exclusively on Whittaker's credibility. In that sphere, they were nothing more than unobjectionable argument concerning whether the jury should believe Whittaker. (See People v. Dennis (1998) 17 Cal.4th 468, 522 [prosecutor's have wide latitude to discuss and attack witness credibility].) The prosecutor's comments did not broach the reasonable-doubt standard. And any objection to the comments as misstating the standard of proof would have been overruled.

Even in Nguyen, however, the court held that the prosecutor's improper attempt to define reasonable doubt was harmless because the court properly defined the standard for the jury. (Nguyen, supra, 40 Cal.App.4th 28 at pp. 36–37.) The same is true here. The trial court properly defined the reasonable-doubt standard (CALCRIM No. 220) and gave the jury direction on how to evaluate witness credibility (CALCRIM No. 226). Also, the court instructed the jury that, if the attorneys' statements about the law conflicted with the court's instructions, the jury was to follow the court's instructions. (CALCRIM No. 200.) There is no indication in this record that the jury misunderstood the reasonable-doubt standard or its application to this case. Therefore, even if the prosecutor's comments had been stricken and the jury admonished, it is not reasonably probable defendant would have obtained a better result.

Defendant's contention that trial counsel violated his right to counsel with respect to third party culpability issues is without merit.

People v. Shaffer, 2014 WL 5281062 at *12-14.

*Analysis: Failure to Request Third Party Culpability Instruction*

The undersigned finds that the California Court of Appeal correctly found that petitioner was not prejudiced by trial counsel's failure to request a third party culpability instruction, i.e.,

33

there is no reasonable probability that the outcome of the trial would have been different had the jury received this instruction. The state appellate court correctly found that the reasonable doubt instruction gave petitioner the opportunity to argue, using the third party culpability evidence, that the prosecution did not prove his guilt beyond a reasonable doubt.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

*Analysis: Failure to Object to Prosecutor's Closing Argument*

For the reasons stated by the California Court of Appeal, the undersigned finds that petitioner's trial counsel was not ineffective for failing to object to the prosecutor's closing argument regarding Whittaker. The California Court of Appeal correctly found that the prosecutor's at-issue argument did not misstate the standard of proof, and instead focused on Whittaker's credibility. Petitioner's counsel did not act unreasonably in failing to object to this argument. See Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013) (quoting United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) ("'[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the "wide range" or permissible professional conduct.'") Moreover, as stated above, the jury is presumed to have followed the reasonable doubt instruction. Weeks v. Angelone, 528 U.S. 225, 234 (2000).

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

F. Claim Six: Alleged Insufficient Evidence of Petitioner's Mental State Re: Counts 4-8

*State Court Opinion*

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. The California Court of Appeal denied this claim for the reasons stated herein:

////

34

Defendant contends that there was insufficient evidence to sustain the convictions in counts four through nine against T.T. because she pretended to consent to the sexual activity and caused him to actually and reasonably believe, though mistakenly, that she consented. We conclude that the evidence was sufficient for the jury to determine that defendant (1) did not actually believe T.T. consented and (2), even if he so believed, the belief was unreasonable under the circumstances.

A reasonable and good faith but mistaken belief that a person consented to sexual activity is a defense to some sexual offenses, such as rape. (People v. Mayberry (1975) 15 Cal.3d 143, 153–158 (Mayberry).) "The Mayberry defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to [the sexual activity]. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to [the sexual activity], that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a Mayberry instruction. [Citations.]" (People v. Williams (1992) 4 Cal.4th 354, 360–361, fn. omitted.)

The trial court instructed the jury that "[t]he defendant is not guilty of forcible sexual penetration if he actually and reasonably believed that the other person consented to the act. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the other person consented. If the People have not met this burden, you must find the defendant not guilty." The court gave the same instruction with respect to oral copulation and rape.

Marshalling the evidence of what happened only after he first entered T.T.'s apartment in the middle of the night, attacked her, choked her, forced her to the floor, and orally copulated her, defendant argues that the evidence was insufficient for the jury to conclude that T.T. did not consent to the later sexual activity. He therefore claims that there is insufficient evidence to support the convictions for sexual penetration and rape of T.T. as alleged in counts four through nine.

We consider all of the evidence in the light most favorable to the prosecution in determining whether it was sufficient to sustain the convictions. (Farnam, supra, 28 Cal.4th at pp. 142–143.)

A friend introduced defendant to T.T. in October 2010. At approximately 3:00 in the morning on Thanksgiving, defendant knocked on T.T.'s apartment door. T.T., who was doing housework at the time, asked through the door who was there. Defendant, who was acquainted with T.T., identified himself and said that he was

35

there about a debt T.T. owed to a neighbor. T.T. let defendant into the apartment.

After the two talked for about a minute, defendant grabbed T.T. by the throat, said, "Bitch, you're gonna give me some pussy," and threw her against the wall. T.T. was scared because defendant was bigger and stronger. Defendant threw T.T. to the floor, told her to take her pants off, had her pull her shirt up above her breasts, told her to keep her hands on her breasts, and then he orally copulated her.

Going into "survival mode," T.T. tried to assure defendant that everything was okay. They went to the couch, where defendant put his finger in T.T.'s vagina more than once. T.T. asked him not to do that.

Defendant told T.T. to orally copulate him. She did not want to, but she complied. When she first started, he let her believe that she was not doing it right when he said, "[S]ee, you don't like me." She then, in her words, "proceeded to do it right." She was afraid that, if she did not do it that way, he would hurt her.

More than once, defendant inserted his penis into T.T.'s vagina.

At one point, defendant had gone into the bathroom. Using the word "hon" to refer to him, she asked where he was. She also rubbed his shoulders and asked defendant what he wanted with an "old cougar" like her. (T.T. was 54 years old at the time of defendant's crimes, while defendant was 31.) She spoke that way trying to convince him that everything was okay so that he would not hurt her.

T.T. acted like they were on a date, but that appears to have been after the sexual activity. Defendant told her he wanted to be her "man," and T.T. told him he could move in.

At approximately 6:00 a.m., while defendant was still in T.T.'s apartment, four people came into the apartment at different times. T.T. did not seek help from them because the rape had already happened and she did not want to get them involved. She also wanted to maintain defendant's trust.

Defendant eventually left and, two days later, T.T. went to the hospital and reported that she had been raped.

Defendant is six feet tall and weighs 250 pounds. Although there was no direct evidence of T.T.'s size, she testified that defendant was able to subdue her quickly when he first attacked her. Therefore, we may infer that she was smaller and weaker.

Around December 22, defendant returned to T.T.'s apartment. T.T. refused to open the door, but defendant said he wanted to "bless" her and to apologize.

Defendant testified that in October, T.T. had said she thought

defendant was sexy. In exchange for methamphetamine, T.T. orally copulated defendant on that occasion. The night before Thanksgiving he went to T.T.'s apartment. They got high on methamphetamine and had oral sex. They tried but were unable to have vaginal sex because defendant was high and could not maintain an erection. Defendant claimed he did not threaten T.T. or use violence.

Defendant argues that (1) because T.T. tried to make him believe that she consented to the sexual activity after the initial attack and oral copulation and (2) he used no further violence to get T.T. to submit to sexual activity (see People v. Ireland (2010) 188 Cal.App.4th 328, 337–338 [violence after initial consent may negate consent] ), no rational trier of fact could have found that he did not believe that T.T. consented to the acts charged in counts four through nine. We disagree because (1) the testimony does not necessarily support defendant's view that T.T.'s efforts to make defendant think she was consenting came before or during the sexual activity charged in counts four through nine and (2) there was sufficient evidence to support the jury's determination that defendant's belief was unreasonable.

Viewing the evidence in the light most favorable to the verdict, it appears that T.T.'s efforts to make defendant think everything was okay came after the sexual activity. Her rubbing his shoulders, calling him "hon," and asking him to move in with her appears to have occurred after the sexual activity. Therefore, it could not have had an effect on his belief during the sexual activity.

In any event, the evidence was sufficient for the jury to conclude that defendant could not reasonably have believed that T.T. consented to the sexual activity charged in counts four through nine. Defendant, much bigger and stronger than T.T., went to T.T.'s apartment in the middle of the night. When he was let in on a ruse, he almost immediately attacked her violently, choking her, pushing her up against the wall, and then forcing her to the floor before orally copulating her. Any reasonable person would understand that this behavior would have the effect of overcoming the will of a smaller, weaker, vulnerable person in those circumstances. (See People v. Griffin (2004) 33 Cal.4th 1015, 1027–1028 [force served to overcome will of victim to thwart or resist the attack].) Thus, defendant could not use T.T.'s acquiescence, and even apparent consent, to avoid criminal liability for the sexual offenses charged in counts four through nine.

Under these facts, defendant was not entitled to have the jury accept his Mayberry defense. In other words, there was sufficient evidence to sustain the jury's finding that either (1) defendant did not actually believe T.T. consented to the sexual activity charged in counts four through nine or (2), if he actually believed T.T. consented, the belief was unreasonable under the circumstances.

Defendant also claims that, because T.T. "tried to communicate to him, through words and behavior, that she did consent, ... [i]t was the People's burden to prove that her efforts were unsuccessful, and

that [defendant] was able to see through her act and knew that she did not consent."

Defendant is mistaken. Even if T.T. succeeded in making defendant think that she consented, defendant's belief was a defense under Mayberry only if it was reasonable under an objective analysis. Here, considering the evidence in the light most favorable to the prosecution, defendant's belief in consent, if he had such a belief, was unreasonable. It appears that any such belief was also untimely because T.T.'s efforts to make defendant believe everything was okay came after the sexual offenses had been committed.

People v. Shaffer, 2014 WL 5281062 at *14-16.

*Analysis*

The legal standard for evaluating a claim alleging insufficient evidence is set forth above in the section addressing petitioner's claim alleging insufficient evidence to support his conviction for count two and the special circumstance finding.

The undersigned finds that the California Court of Appeal correctly described T.T.'s testimony regarding what occurred on Thanksgiving morning. T.T. testified that petitioner asked to come in to her apartment to talk about money she owed a neighbor. (RT at 761.) T.T. testified that after she let petitioner in, they talked for about a minute. (Id. at 762.) Petitioner then grabbed T.T. by the neck and said "bitch, you're gonna give me some pussy," then threw her against the wall. (Id.) T.T. testified that petitioner was bigger than her and stronger than her. (Id.) T.T. testified that after he threw her against the wall, he threw her on the floor. (Id.) Petitioner then began to orally copulate her. (Id. at 763.)

T.T. testified that after petitioner began assaulting her, she went into survival mode. (Id. at 764.) In order to stop the violence, T.T. tried to make petitioner think that everything he was doing was okay. (Id. at 765.)

Petitioner and T.T. later moved to the couch where he put his finger in her vagina. (Id. at 765.) Petitioner told her to orally copulate him. (Id. at 766.) Petitioner told her that she was not doing it right so she "proceeded to do it right." (Id.) T.T. testified that petitioner put his penis in her vagina. (Id. at 767.) T.T. testified that she called petitioner "hon" in an attempt to convince him that it was okay because she did not want to get hurt. (Id. at 767-68.)

The California Court of Appeal correctly found that 1) the testimony did not necessarily

38

support petitioner's view that T.T.'s efforts to make him think that she was consenting came before or during the charged sexual activity; and 2) there was sufficient evidence to support the jury's determination that petitioner's belief was unreasonable. Most importantly, based on T.T.'s testimony that petitioner choked and assaulted her shortly after entering her apartment, the jury had sufficient evidence to find that petitioner could not have reasonably believed that T.T. consented to the sexual activity alleged in counts 4-8.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

G. Claim 7: Alleged Insufficient Evidence to Support Conviction for Two Acts of Oral Copulation/Sentencing Error/Double Jeopardy

*State Court Opinion*

The California Court of Appeal is the last state court to issue a reasoned decision addressing these claims. The California Court of Appeal denied these claims for the reasons stated herein.

Sufficiency of Evidence of Two Acts of Oral Copulation

After T.T. began orally copulating defendant, he asked her to change the way she was doing it. She complied and proceeded to do it "right" "because [she] didn't want [defendant] to think that [she] wasn't liking what [she] was doing." The jury convicted defendant of two counts of oral copulation based on these facts. On appeal, defendant contends there was insufficient evidence to support two different counts of oral copulation in counts five and six because there was not a sufficient break between the two acts. To the contrary, the evidence that T.T. changed the manner in which she was orally copulating defendant supported the jury's verdicts. Defendant also contends that, even if the evidence supported two different counts, section 654 prohibited punishment on both counts. Again, defendant's contention is without merit.

A. Multiple Convictions

To support his argument that there was no break in the oral copulation sufficient to support two convictions for oral copulation in counts five and six, defendant cites cases in which the evidence was found to be sufficient when a perpetrator stopped and then resumed a sexual attack. (See People v. Scott (1994) 9 Cal.4th 331, 345 [defendant's finger dislodged then reinserted in vagina]; People v. Harrison (1989) 48 Cal.3d 321, 329 [defendant stopped then

resumed]; <u>People v. Marks</u> (1986) 184 Cal.App.3d 458 [two sodomies for two insertions].) Those cases, however, involve facts dissimilar to this case.

The facts of this case are similar to the facts of another case in which the court found sufficient evidence to support multiple convictions. (<u>People v. Catelli</u> (1991) 227 Cal.App.3d 1434, 1446 (<u>Catelli</u>).) In <u>Catelli</u>, the defendant forced one victim to suck his penis while another licked his scrotum. He then had them change places. (<u>Ibid.</u>) Rejecting the argument that these facts did not support two counts of oral copulation as to each victim, the court said: "First, [defendant] asserts that 'merely changing the location of copulation that occurs on the same organ, without interruption, cannot constitute separate offenses.' In support of this contention, defendant 'maintains that a man's scrotum and penis constitute the male "sexual organ" for purposes of section 288a. Accordingly, any uninterrupted act of copulating different parts of a man's "sexual organ" constitutes but a single offense.' (Italics in original.) [¶] The flaw in defendant's argument is that the acts were not uninterrupted. Rather, they were separated in time and by a change in position. It is now settled that an accused may be convicted for multiple, nonconsensual sex acts of an identical nature which follow one another in quick, uninterrupted succession. (<u>People v. Harrison</u> [, <u>supra</u>,] 48 Cal.3d [at pp.] 327–334.)" (<u>Catelli</u>, <u>supra</u>, at p. 1446.)

Defendant argues that <u>Catelli</u> does not support the jury's verdicts in this case because, in defendant's words, "there must be a break in the oral-genital contact (ending one offense) and a reestablishment of contact (beginning another offense)." Defendant's argument is unconvincing because in <u>Catelli</u> there was no direct evidence of a break in the victims' contact with the defendant's genitals, even though it can be inferred from the changing of positions. The same is true in this case. The evidence was sufficient to allow the jury to infer that, in changing the manner in which T.T. was orally copulating defendant, the requisite break took place sufficient to justify conviction on two counts.

T.T. testified that defendant directed her to orally copulate him. She began, and defendant said "[S]ee, you don't like me." T.T. then changed the manner in which she was orally copulating defendant. The jury could reasonably infer that this sequence (beginning, communication about the manner, then changing of the manner) included a break in the oral copulation.

Therefore, the facts supported two convictions for oral copulation in counts five and six.

B. Section 654

Defendant also argues that, even if there was sufficient evidence for two oral copulation convictions in counts five and six, section 654 prohibits punishment on both counts because they were based on the same indivisible act. This argument is without merit because they were not based on the same indivisible act; instead, they were based on the first act of oral copulation and the later change in the

40

manner of oral copulation.

Section 654, subdivision (a) states, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The general rule in sex cases is that section 654 does not apply to separate sexual acts perpetrated against a victim occurring during a single encounter. (People v. Harrison, supra, 48 Cal.3d at pp. 334–337.)

Here, as discussed, the two oral copulations charged in counts five and six were separate acts divided by a break when T.T. complied with defendant's encouragement to change the manner in which she was orally copulating him. Therefore, section 654 does not prohibit separate punishment for each conviction.

People v. Shaffer, 2014 WL 5281062 at *16-17.

*Analysis - Alleged Insufficient Evidence*

Petitioner is challenging the sufficiency of the evidence with respects to counts five and six. (See RT at 1044 (prosecutor's closing argument).) The California Court of Appeal correctly stated that these counts were based on T.T.'s oral copulation of petitioner. (See id.) The evidence in support of this conviction was T.T.'s testimony. In relevant part, T.T. testified:

Q: And how many times did you have to orally copulate his penis?

A: When I first started he said to me, see, you don't like me. 'Cause I wasn't doing it right. And I proceeded to do it the right way.

Q: Why did you proceed to do it right?

A: Because I didn't want him to think that I wasn't liking what I was doing.

(RT at 766.)

Relying on People v. Catelli, 227 Cal.App.3d 1434 (1991), the California Court of Appeal found that the testimony cited above was sufficient evidence to support two different convictions for oral copulation. As stated above, citing Catelli, the California Court of Appeal stated that an accused may be convicted for multiple, nonconsensual acts of an identical nature which follow one another in quick, uninterrupted succession. The California Court of Appeal found that the evidence was sufficient to allow the jury to infer that, in changing the manner in which T.T

41

orally copulated petitioner, the requisite break took place sufficient to justify petitioner's conviction on two counts.

T.T.'s testimony regarding how she changed the manner she orally copulated petitioner after he complained is vague. However, when the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S. at 326. Because the jury could have reasonably inferred from T.T.'s testimony that she sufficiently changed the manner in which she orally copulated petitioner to support two separate convictions for oral copulation, this court defers to that resolution.[5]

The California Court of Appeal did not violate clearly established Supreme Court authority when it found that sufficient evidence supported petitioner's convictions for counts five and six. Accordingly, this claim should be denied.

*Analysis—Alleged Sentencing Error Based on California Penal Code Section 654/Double Jeopardy*

Petitioner's claim alleging a violation of California Penal Code § 654 is not cognizable in federal habeas. See Watts v. Bonneville, 879 F.2d 685, 687-88 (9th Cir. 1989).

Although petitioner raised his double jeopardy claim in his appeal, the opinion of the

_____

[5]  In his petition for review filed in the California Supreme Court, petitioner argued that "the test employed by the California Court of Appeal – which would allow for multiple convictions based on a change in technique rather than a break in contact – is contrary to the case law cited above." (Respondent's Lodged Document 5 at 9.)  The California Court of Appeal did not state that multiple convictions for oral copulation could be found if there was no break in contact.  The California Court of Appeal said, "Defendant's argument is unconvincing because in Catelli there was no direct evidence of a break in the victims' contact with the defendants' genitals, even though it can be inferred form the changing of positions.  The same is true in this case.  The evidence was sufficient to allow the jury to infer that, in changing the manner in which T.T. was orally copulating defendant, the requisite break took place sufficient to justify conviction on two counts."  (ECF No. 28-1 at 33.)

Moreover, federal courts will not review an interpretation by a state court of its own laws unless that interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the rights guaranteed by the Constitution.  Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975).  The decision by the California Court of Appeal regarding what is required to support a conviction for violating California Penal Code § 288(a), i.e., oral copulation, is not untenable and does not amount to a subterfuge.

42

California Court of Appeal did not address this claim. (See Respondent's Lodged Document 1 at 106 (petitioner's opening brief on appeal).) Accordingly, this court independently reviews the record to determine whether habeas corpus relief is available with respect to this claim. See Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The Double Jeopardy Clause provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The U.S. Supreme Court has held the Double Jeopardy Clause protects against multiple criminal punishments for the same offense. Monge v. California, 524 U.S. 721, 727–28 (1998) (internal citation omitted). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not ...." Brown v. Ohio, 432 U.S. 161, 166 (1977) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). "If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Brown, 432 U.S. at 166 (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)).

As discussed above, counts five and six were based on two separate acts of oral copulation, based on T.T.'s reasonably inferred break from contact with petitioner's penis. Thus, each conviction required proof of a fact that the other did not. For this reason, petitioner's Double Jeopardy claim is without merit.

After independently reviewing the record, the undersigned finds that the denial of this claim by the California Supreme Court was not an unreasonable application of Supreme Court authority. Accordingly, this claim should be denied.

H. Supplemental Petition

In his supplemental petition, petitioner alleges that he was tried before an all-white jury "that was grand jury of prejudicial error." (ECF No. 27 at 1.) The supplemental petition contains no further discussion of this claim. Petitioner also alleges that he has newly discovered evidence challenging the validity of the DNA evidence offered against him at trial. (Id. at 1.)

43

1    In the answer, respondent argues that petitioner's new claims should be denied on the

2    merits. Respondent also argues that the new claims are not exhausted. The undersigned agrees

3    with respondent that the two new claims raised in the supplemental petition have not been

4    exhausted.

5    On June 7, 2008, the undersigned ordered petitioner to show cause why the new claims

6    raised in the supplemental petition were not barred by the statute of limitations. See Herbst v.

7    Cook, 260 F.3d 1039, 1042-43 (9th Cir. 2001) ("the district court has the authority to raise the

8    statute of limitations sua sponte and to dismiss the petition on those grounds, [but] that authority

9    should only be exercised after the court provides the petitioner with adequate notice and an

10   opportunity to respond.") (ECF No. 35.) Petitioner did not respond to this order.

11   For the reasons stated herein, the undersigned finds that petitioner's claim regarding the

12   all-white jury should be dismissed as barred by the statute of limitations. The undersigned

13   recommends that petitioner's claim regarding DNA evidence be dismissed for lack of merit.

14        1. Claim Alleging All-White Jury

15   The statute of limitations provides that,

16        A 1-year period of limitation shall apply to an application for a writ
     of habeas corpus by a person in custody, pursuant to the judgment
17        of a State court. The limitation period shall run from the latest of –

18        (A) the date on which the judgment became final by the conclusion
     of direct review or the expiration of the time for seeking such
19        review;

20        (B) the date on which the impediment to filing an application
     created by State action in violation of the Constitution or laws of
21        the United States is removed, if the applicant was prevented from
     filing by such State action;

22

23        (C) the date on which the constitutional right asserted was initially
     recognized by the Supreme Court, if the right has been newly
     recognized by the Supreme Court and made retroactively applicable
24        to cases on collateral review; or

25        (D) the date on which the factual predicate of the claim or claims
     presented could have been discovered through the exercise of due
26        diligence.

27   28 U.S.C. § 2244 (d)(1).

28        The California Supreme Court denied petitioner's petition for review on January 28, 2015.

44

1 (Respondent's Lodged Document 6.)  Therefore, petitioner's conviction became final 90 days

2 later on April 28, 2015, when the period for filing a petition for writ of certiorari with the United

3 States Supreme Court expired.  See Bowen v. Roe, 188 F.3d 1157 (9th Cir. 1999).  The one year

4 limitations period commenced running the following day, i.e., April 29, 2015.  See Patterson v.

5 Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).  The statute of limitations expired one year later on

6 April 29, 2016.  Petitioner's claim regarding the all-white jury, raised in the supplemental petition

7 filed June 21, 2017, is not timely unless petitioner is entitled to statutory or equitable tolling.

8      Petitioner is not entitled to statutory tolling pursuant to 28 U.S.C. § 2244(d)(2) because he

9 did not file any state habeas corpus petitions.  In addition, the undersigned finds no grounds in

10 support of equitable tolling.  See Holland v. Florida, 560 U.S. 631, 645 (2010) (the one year

11 statute of limitations for filing a habeas petition may be equitably tolled if extraordinary

12 circumstances beyond a prisoner's control prevent the prisoner from filing on time).  Thus,

13 petitioner's claim regarding the all-white jury is barred by the statute of limitations.

14      The undersigned also observes that even if petitioner were to exhaust this claim, it would

15 still be untimely as it does not relate back to the claims raised in the original petition.  The

16 Supreme Court has held a petitioner "may amend a new claim into a pending federal habeas

17 petition after the expiration of the limitations period only if the new claim shares a 'common core

18 of operative facts' with the claims in the pending petition."  King v. Ryan, 564 F.3d 1133, 1141

19 (9th Cir. 2009) (quoting Mayle v. Felix, 545 U.S. 644, 659 (2005)).  A new claim does not relate

20 back simply because it is related to the same trial, conviction, or sentence as the original claims.

21 Mayle, 545 U.S. at 662.  Rather, relation back will be allowed where the new claim is "based on

22 the same facts as the original pleading and only changes the legal theory."  Id. at 664 n.7 (internal

23 quotation marks and citation omitted).  Otherwise, the statute of limitations "would have slim

24 significance."  Id. at 662.

25      None of the claims raised in the amended petition relate to petitioner's claim regarding the

26 all-white jury.  Accordingly, petitioner's claim regarding the all-white jury is time barred.

27     2. Claim Challenging DNA Evidence

28      Petitioner alleges that he has newly discovered evidence challenging the validity of the

DNA evidence offered against him at trial. (ECF No. 27 at 1.) Petitioner suggests that the DNA

evidence presented at trial was false and wrongly used to convict him. (Id.) It appears that

petitioner is raising a Brady[6] claim. To prove a Brady violation, petitioner must show that:

(1) the evidence is newly discovered; (2) the evidence was suppressed by the prosecution; and

(3) the evidence was material. United States v. Williams, 547 F.3d 1187, 1202 (9th Cir. 2008).

      After further consideration, the undersigned finds that petitioner's Brady claim may relate

back to his claims challenging the insufficiency of the evidence to support of his convictions for

Count 2 and the related special circumstance. In finding sufficient evidence to support Count 2

and the related special circumstance, the California Court of Appeal cited petitioner's DNA found

on R.S.'s body. Therefore, petitioner's Brady claim, alleging that the prosecutor withheld

exonerating DNA evidence, may not be barred by the statute of limitations were petitioner to

exhaust this claim in state court. Accordingly, the undersigned herein addresses the merits of this

claim instead. 28 U.S.C. § 2254(b)(2) (an application for habeas corpus may be denied on the

merits, notwithstanding the failure of the applicant to exhaust state court remedies).

*Background*

      Petitioner argues that the new evidence shows that the DNA evidence offered at trial was

not "not suitable for comparison to reference profiles due to the quality of the mixture." (Id. at 1.)

Petitioner argues that his newly discovered evidence shows that profiles "were compared using

Yfiler tm results to petitioner's reference profile and used as conclusive evidence to convict

petitioner at trial." (Id.)

      Attached to petitioner's supplemental petition are pages 10-12 from a report prepared by

Criminalist Shaw. (Id. at 5-7.) Shaw signed this report on March 15, 2011. (Id. at 7.) The pages

of these reports contain results from "Identifiler" and "Yfiler" genetic profile tests.

      The Identifiler genetic results were from swabs taken from R.S.'s right breast, neck,

fingerprints on her abdomen, left breast, clothing, a hair and her rectum. (Id. at 5.) The report

states that the Identifiler genetic profile from the victim's right breast swab contained a mixture of

---

[6] Brady v. Maryland, 373 U.S. 83 (1963).

DNA from three contributors.  (Id.)  The victim was one of the contributors.  (Id.)  Petitioner was the major DNA contributor, and George Nixon was a minor contributor.  (Id.)

The report states that the Identifiler genetic profile from the victim's neck is a mixture of DNA, with the victim being the major contributor, and the "minor alleles detected with the major contributor to the remaining profile from" the right breast swab, i.e., petitioner.  (Id.)  The report states that petitioner, Nixon, and the victim can be excluded as contributors to the partial profile from the left pocket of the blue jeans and the minor alleles from the right pocket of the jeans. (Id.)

The report states that the Identifiler genetic profile for the non-sperm fraction of the victim's rectal swab matched the victim.  (Id. at 6.)  A partial profile consisting of a single "X" allele was obtained from the sperm fraction.  (Id.)

Finally, the report states that the Identifiler genetic profiles from the swabs from the fingerprints on the victim's abdomen and left breast are "mixtures of at least three contributors. Due to the quality of the mixture profile, these mixtures are inconclusive and are not suitable for comparison."  (Id. at 5.)  Petitioner apparently refers to this finding in his supplemental petition.

The Yfiler Results states that the genetic profiles were obtained from swabs from the fingerprints on the victim's abdomen and left breast.  (Id. at 6.)  The Yfiler genetic profile from the victim's right breast was a mixture.  (Id.)  "Assuming two contributors, the partial profile obtained from the major contributor [to the right breast genetic profile] is consistent with the partial profiles obtained" from the fingerprints on the victim's abdomen and left breast."  (Id.) "These three partial profiles are consistent with the reference profile obtained for" petitioner. (Id.)  "Therefore, neither [petitioner] nor any of his paternal male relatives can be excluded as the source of this profile."  (Id.)

The Yfiler report states that the three alleles were obtained from the swab from the neck. (Id.)  These alleles are consistent with the partial profiles from the fingerprints on the victim's abdomen and left breast swab, and the major contributor to the genetic profile from the right breast swab.  (Id.)

Also attached to the supplemental petition is a page from what appears to be a brief from

47

1    petitioner's state appeal.  (<u>Id.</u> at 8.)  This brief states that at petitioner's trial, criminalist Shaw

2    testified as an expert in DNA analysis, including both STR and Y-STR analysis.  (<u>Id.</u>)

3         *Analysis*

4         As discussed above, to prove a <u>Brady</u> violation, petitioner must first show that the

5    evidence is newly discovered.  It is clear that criminalist Shaw's report attached to the

6    supplemental petition is not newly discovered evidence.  This report was prepared in March 2011,

7    which is before petitioner's trial began in November 2011.  It is also clear that criminalist Shaw

8    testified regarding this report at trial.  For example, Shaw testified regarding the results of "Y-

9    STR" profile testing, and referred to fingerprint swabs taken from R.S. abdomen, identified as

10   item no. FAS-12.  (RT at 658.)  Shaw's April 5, 2011 report also identifies the swabs taken from

11   R.S.'s abdomen as item no. FAS12.  (ECF No. 27 at 6.)  Thus, the March 5, 2011 report is not

12   newly discovered evidence.

13        The undersigned also finds that petitioner has presented no evidence that Shaw's March 5,

14   2011 report was suppressed by the prosecution.

15        While the report is material, it is not material as alleged by petitioner.  Petitioner's claim

16   that the report contains exonerating evidence appears to be based on a misreading of the report.

17   Petitioner appears to argue that criminalist Shaw's report, discussed above, did not find

18   petitioner's DNA on the samples taken from R.S.'s abdomen and left breast.  Petitioner is correct

19   that the report, attached to the supplemental petition, states that the results from the Identifiler

20   genetic profiles taken from R.S.'s abdomen and left breast were inconclusive.  However, the

21   results of the Yfiler genetic profiles taken from swabs on the victim's abdomen and left breast

22   were consistent with the reference profile obtained for petitioner.

23        At trial, criminalist Shaw testified about the "Y-STR DNA testing" results taken from the

24   victim's abdomen.  (<u>Id.</u>)  As discussed above, Shaw testified that petitioner's profile was found

25   on the swab taken from the fingerprints on R.S.'s abdomen.  (<u>Id.</u> at 658-59.)  Shaw also testified

26   that petitioner's DNA was found on a swab taken from R.S.'s left breast.  (<u>Id.</u> at 661.)

27        Petitioner's claim that the report attached to his supplemental petition demonstrates that

28   none of his DNA was found on the swabs taken from R.S.'s abdomen and left breast is a

misreading of the report.  It appears that criminalist Shaw's testimony was not inconsistent with the report.

For the reasons discussed above, petitioner's <u>Brady</u> claim is without merit and should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 24, 2018

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Shaff2951.157.kc

49